**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Christine M. Arguello**

Civil Action No. 12-cv-01907-CMA-BNB

XEDAR CORPORATION,

      Plaintiff,

v.

DON RAKESTRAW,

      Defendant.

---

**ORDER GRANTING IN PART AND DENYING IN PART
MOTION TO DISMISS COUNTERCLAIMS**

---

      This matter is before the Court on XeDAR Corporation's ("XeDAR") Motion to Dismiss Rakestraw's Counterclaims, filed on August 17, 2012. (Doc. # 9.) For the following reasons, XeDAR's Motion is granted in part and denied in part.

## I. BACKGROUND[1]

      In 1996, Defendant Don Rakestraw ("Rakestraw") co-founded Point One LLC, a marketing, strategic planning, and government services firm. (Doc. # 6, ¶ 37.) In March of 2007, Point One was acquired by XeDAR through a stock transfer deal. As part of the stock transfer deal, Rakestraw was guaranteed 1,552,500 shares of XeDAR stock. (*Id.* at ¶ 39.) Between March 2007 and May 2011, as compensation

---

[1] The following facts are allegations taken from the "counterclaims" section of Defendant Rakestraw's Answer and are deemed true for purposes of the instant motion. (*See* Doc. # 6.)

for his ongoing services to XeDAR, Rakestraw acquired an additional 303,695 shares of XeDAR stock.  (*Id.*, ¶ 40.)

In the second half of 2011, XeDAR began repurchasing shares from certain of its shareholders.  (*Id.*, ¶ 41.)  Rakestraw first learned about the repurchase offers in late December 2011 or early January 2012.  Shortly thereafter, Rakestraw contacted XeDAR to inquire why it was attempting to repurchase outstanding shares.  (*Id.*, ¶ 42.)

On or about January 10, 2012, Rakestraw contacted Bob Johnson, the President of Pixxures, a subsidiary of XeDAR and the only revenue generating part of XeDAR. Rakestraw specifically requested information regarding any potential acquisition or interested parties, and Mr. Johnson allegedly informed Rakestraw that there were no companies interested in acquiring Pixxures or XeDAR.  (*Id.*, ¶ 43.)  In late February 2012, Rakestraw spoke with his broker who confirmed that XeDAR was repurchasing shares from its shareholders, and would be willing to purchase Rakestraw's shares as well.  (*Id.*, ¶ 44.)  Rakestraw then contacted Hugh Williamson, the CEO and Chairman of XeDAR, to inquire further about the repurchase offer.  Mr. Williamson allegedly confirmed that XeDAR was willing to repurchase Rakestraw's shares and directed him to confer with the Company's Controller, Dawn Patterson, regarding any additional information that Rakestraw needed to evaluate the offer.  (*Id.*, ¶ 45.)

Rakestraw contacted Ms. Patterson on March 1 and March 2, 2012.  During the March 2 discussion, Rakestraw made clear that the possibility of an acquisition was central to his decision to sell his shares, and stated that he had no intention of selling

2

his shares if there was any potential acquisition interest.  (*Id.*, ¶ 46.)  Ms. Patterson allegedly told Rakestraw that the repurchase offer would remain open for only another week or two, and explicitly assured Rakestraw that no companies had expressed any interest in acquiring either XeDAR or Pixxures.  (*Id.*, ¶ 47.)

Based upon the representations of XeDAR and its agents, Rakestraw entered into a repurchase agreement (the "Repurchase Agreement") with XeDAR, whereby XeDAR repurchased all 1,856,195 shares held by Rakestraw at $0.17 a share, compensating him $315,553.15 in a transaction that was completed on March 8, 2012. (*Id.*, ¶ 48.)  On March 23, 2012, fifteen days after the repurchase was completed, IHS Global, Inc. ("IHS") delivered a formal "indication of interest" to XeDAR concerning its desire to acquire XeDAR.  (*Id.*, ¶ 50.)  Five days later, IHS and XeDAR entered into a "Letter of Intent."  (*Id.*)  As a result of the acquisition, the value of XeDAR shares increased to $0.88 a share.  (*Id.*, ¶ 52.)  Rakestraw alleges that XeDAR and its officers failed to disclose that they had been engaging in discussions with IHS regarding the acquisition, and that he would not have sold his shares to XeDAR had he known of IHS' interest in XeDAR.   (*Id.*, ¶¶ 49, 60.)

Based on his belief that XeDAR and its officers failed to disclose IHS' interest in acquiring XeDAR, Rakestraw served XeDAR with a confidential settlement demand letter.  In response, XeDAR filed a complaint in Colorado state court on June 28, 2012, seeking declaratory and injunctive relief.  (Doc. # 1-3.)  Rakestraw then removed the case to this Court on July 23, 2012.  (Doc. # 1.)  Four days later, Rakestraw filed his

3

Answer to XeDAR's complaint, asserting the following five counterclaims: (1) common law fraud; (2) common law negligent misrepresentation; (3) violations of section 10(b) and Rule 10b-5 of the Securities Exchange Act of 1934; (4) breach of contract; and (5) breach of fiduciary duty.  (Doc. # 6 at 12-16.)

XeDAR filed the instant motion to dismiss Rakestraw's counterclaims on August 17, 2012.  (Doc. # 9.)  Rakestraw responded on September 7, 2012, and XeDAR replied on September 24, 2012.  (Doc. ## 13, 14.)

## II. <u>STANDARD OF REVIEW</u>

The purpose of a motion to dismiss under Fed. R. Civ. P. 12(b)(6) for failure to state a claim is to test "the sufficiency of the allegations within the four corners of the complaint."  *Mobley v. McCormick*, 40 F.3d 337, 340 (10th Cir. 1994).  A complaint will survive such a motion only if it contains "enough facts to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  For a motion to dismiss, "[t]he question is whether, if the allegations are true, it is plausible and not merely possible that the plaintiff is entitled to relief under the relevant law." *Christy Sports, LLC v. Deer Valley Resort Co.*, 555 F.3d 1188, 1192 (10th Cir. 2009). "The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotation marks and citation omitted).

In reviewing a Rule 12(b)(6) motion, a court must accept all the well-pleaded allegations of the complaint as true and must construe them in the light most favorable

4

to the plaintiff. *Williams v. Meese*, 926 F.2d 994, 997 (10th Cir. 1991). Nevertheless, a complaint does not "suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557). "The court's function on a Rule 12(b)(6) motion is not to weigh potential evidence that the parties might present at trial, but to assess whether the plaintiff's complaint alone is legally sufficient to state a claim for which relief may be granted." *Miller v. Glanz*, 948 F.2d 1562, 1565 (10th Cir. 1991).

## III. ANALYSIS

In the instant Motion, XeDAR seeks dismissal of Rakestraw's counterclaims for three reasons. First, XeDAR argues that the Repurchase Agreement signed by both parties precludes Rakestraw from bringing his counterclaims, and this lawsuit should therefore be dismissed with prejudice. Next, XeDAR contends that the counterclaims should be dismissed with prejudice under Colorado's economic loss rule. Lastly, XeDAR argues that the counterclaims should be dismissed without prejudice because Rakestraw's allegations are insufficient under the *Iqbal/Twombly* pleading standard.

## A. WHETHER THE REPURCHASE AGREEMENT BARS RAKESTRAW'S COUNTERCLAIMS

XeDAR contends that Rakestraw's claims are barred by the covenant not to sue contained in the Repurchase Agreement. Under Colorado law,[2] a "release is an agreement to which the general contract rules of interpretation and construction apply."[3]

---

[2] The parties do not dispute, and the Court agrees, that Colorado law applies in this case.

[3] Only XeDAR has paid any attention to the question of whether there is any meaningful distinction between a release and a covenant not to sue. (Doc. # 9 at 7-8.) Although there

*Chase v. Dow Chemical Co.*, 875 F.2d 278, 281 (10th Cir. 1989) (citation omitted).

Thus, like any other contract, a release that is procured through fraud may be held

unenforceable.  *See id.*  Here, Rakestraw alleges that XeDAR's fraudulent statements

induced him to enter into the Repurchase Agreement.

Notwithstanding the general rule that fraud may invalidate an otherwise

enforceable release, XeDAR cites to several cases from other jurisdictions where courts

have enforced releases despite allegations of fraud because the contractual agreement

at issue contained explicit disclaimer-of-reliance language.

Although XeDAR relies only on cases from other jurisdictions, the Court begins

its analysis by considering analogous Colorado state cases.  In the context of a case

where a consumer sued a manufacturer for negligent misrepresentation, the Colorado

Supreme Court considered the enforceability of a release that read:

> Buyer recognizes that any advertisements, brochures, and other
> written statements which he may have read . . . as well as any oral state-
> ment which may have been made to him, concerning the potential of the
> Harvestore . . . are not guarantees and he has not relied upon them as
> such.
>
> * * *
>
> [Buyer has] read and understood the terms and conditions of this
> purchase order including the warranties, disclaimers and terms and
> conditions herein given to me, either by the manufacturer or the seller.

---

is some out-of-jurisdiction authority suggesting that a covenant not to sue is not a present
relinquishment of a right or claim but merely an agreement not to enforce an existing cause of
action, the general rule is that a covenant not to sue "has a legal effect identical to a release
and may be pleaded in bar of a subsequent action." 76 C.J.S. Release § 47.  The only
Colorado authority that the Court has found on this issue indicates that a covenant not to sue
and a release are treated identically.  *See Ochoa v. Vered*, 212 P.3d 693, 968 ("we perceive no
distinction between a release and a covenant for purposes of preserving a respondeat superior
claim against the employer.").  Thus, the Court finds that there is no meaningful distinction
between a release and a covenant not to sue.

> [Buyer relies] on no other promises or conditions and regards that as
> reasonable because these are fully acceptable to [Buyer].

*Keller v. A.O. Smith Harvestore Prods., Inc.*, 819 P.2d 69, 74 (1991).  The Colorado

Supreme Court held that this disclaimer-of-reliance clause did not bar the plaintiff's

claim for negligent misrepresentation because the disclaimer was not "couched in clear

and specific language."  *Id.*  The Colorado Supreme Court found that the language did

not "clearly and specifically disclaim reliance" by the buyers on all representations made

by the seller prior to the execution of the contract.  *Id.*  In a more recent opinion, the

Colorado Court of Appeals found that a similar disclaimer in a franchisor-franchisee

agreement was not couched in sufficiently "clear and specific language" so as to bar

a claim for intentional fraud.[4]  *See Colorado Coffee Bean, LLC v. Peaberry Coffee Inc.*,

251 P.3d 9, 22 (Colo. App. 2010).  Thus, the Court will review the Repurchase

Agreement in light of the "clear and specific" standard.[5]

---

[4] *Colorado Coffee Bean* also recognized that some jurisdictions have held that "public policy precludes such broadly drawn exculpatory clauses from protecting a fraud feasor." 251 P.3d at 22 n.10.  As in *Colorado Coffee Bean*, the Court need not reach this issue because it finds the Repurchase Agreement does not contain an explicit disclaimer-of-reliance provision.  *See id.*

[5] Neither *Keller* or *Colorado Coffee Bean* considered the enforceability of the release provisions in the context of a stock purchase.  Nonetheless, the Court perceives no reason that the *Keller* standard would not apply.  One factor that might weigh in favor of a laxer standard of scrutiny in the stock purchase context is the relative sophistication of the parties.  *See Barr v. Dyke*, 49 A.3d 1280, 1289 (Me. 2012) (looking at the parties' knowledge in business matters as a factor in determining whether to enforce a disclaimer of reliance provision).  On the other hand, at the time that Rakestraw completed the Repurchase Agreement, he was a fiduciary of XeDAR and there was not yet an adversarial relationship between them.  Thus, Rakestraw might have been more justified in relying on XeDAR's representations than a buyer with no fiduciary relationship to the seller.  *See id.* (rejecting argument that disclaimer of reliance clause should not be enforced when the party seeking enforcement was in a fiduciary relationship to the party alleging fraud only because the fiduciary relationship was adverse at the time of the alleged fraud).

The Repurchase Agreement provides, in relevant part, that:

(d)  You [Rakestraw] have been provided the last two Shareholder communications giving you the Company's results for the 3rd and 4th fiscal quarters and the CVE 2011 results.  You have also had adequate opportunity to discuss the terms of this letter agreement, as well as the Company's business, management and financial affairs, with the Company's management and to obtain any additional information necessary to assess the value of the Shares and your decision to sell the Shares, verify the accuracy of the information provided to you and such other information as you consider necessary or appropriate to evaluate the merits and risks of engaging in the transactions contemplated hereby.  As a result of such analysis, you have decided that the personal benefit of immediate liquidity outweighs any benefits which you may realize by continuing to hold the Shares.

(e)  You agree not to file, pursue or participate in any claims, charges, actions or proceedings of any kind in any forum against the Company or any of its officers, directors, shareholders or agents (collectively, the "Company Releases") with respect to the repurchase of your Shares and the basis for your determination to sell the Shares to the Company.  Further if you initiate any lawsuit or other legal proceeding against any Company Releasee in contravention of this covenant not to sue, you will pay for all costs incurred by such Company Releasee, including reasonable attorneys' fees, in defending against the such [sic] claim and you shall indemnify such Company Releasee against any and all damages assessed or losses incurred in connection therewith.[6]

(Doc. # 9-1.)  The Court finds that this language appears to be a general release

disclaimer and does not contain any explicit disclaimer-of-reliance language.  In its

---

[6] Ordinarily, if a district court considers materials outside of the pleadings, the Court must convert a motion to dismiss to one for summary judgment, and all parties must be given reasonable opportunity to present all material pertinent to such a motion under Fed. R. Civ. P. 56.  *See* Fed. R. Civ. P. 12(d).  However, "the district court may consider documents referred to in the complaint if the documents are central to the plaintiff's claim and the parties do not dispute the documents' authenticity."  *Alvarado v. KOB-TV, L.L.C.*, 493 F.3d 1210, 1215 (10th Cir. 2007) (quoting *Jacobsen v. Deseret Book Co.*, 287 F.3d 936, 941 (10th Cir. 2002)).  Here, the Repurchase Agreement was referred to in the operative pleading, the Repurchase Agreement is central to the claims at issue, and the parties do not dispute the authenticity of the Repurchase Agreement.  Thus, the Court may consider the Repurchase Agreement without converting the instant motion into one for summary judgment.

Reply, XeDAR asserts that the Repurchase Agreement contains an "explicit disclaimer-of-reliance" but points to nothing in the Repurchase Agreement that is explicit.  (Doc. # 14 at 3.)  Rather, XeDAR argues that the "import" of the language is to disclaim reliance.  (*See id.*)  As explained previously, a contractual agreement disclaiming reliance must be "couched in clear and specific language."  *Keller*, 819 P.2d at 74.  By pointing to the "import" of the language, XeDAR implicitly admits that the release does not contain a "clear and specific" disclaimer-of-reliance clause.  Indeed, the Court finds that the language in the Repurchase Agreement is significantly less clear and specific than the disclaimer-of-reliance provisions held unenforceable in *Keller* and *Colorado Coffee Bean*.

The Court's conclusion that the Repurchase Agreement does not bar claims of intentional fraud is further bolstered by review of the cases cited by XeDAR.  Although several state high courts have held that disclaimer-of-reliance contract provisions may bar fraud claims by shareholders, the disclaimer-of-reliance provisions in those cases were far more specific than the Repurchase Agreement.

In *Barr v. Dyke*, the Maine Supreme Judicial Court held that a disclaimer-of-reliance provision barred a plaintiff from bringing a fraud claim.  In so holding, *Barr* emphasized a provision in the operative contract that provided:  "Seller **has not relied** on Purchaser or any of its directors, officers, shareholders, employees or agents with respect to any assessment of the value of Purchaser or the Shares being sold by such Seller hereunder or the advisability of entering into this Agreement and the transactions

contemplated by it." 49 A. 3d at 1284 (emphasis in original). Thus, the contract in *Barr*

not only expressly disclaimed reliance, but specified the particular subject that the

disclaimer-of-reliance pertained to. As such, *Barr* found that "the disclaimer-of-reliance

clause is itself specific and unambiguous." *Id.* at 1286. Similarly, in *Forest Oil Corp.*

*v. McAllen*, the Supreme Court of Texas held that a disclaimer-of-reliance provision

precluded a fraudulent inducement claim. *See* 268 S.W.3d 51, 61 (Tex. 2008).

In *Forest Oil*, the contractual agreement specifically disclaimed reliance "upon any

statement or any representation of any agent of the parties," and the parties acknowl-

edged that they had been "fully advised" by legal counsel. *See id.* at 54. Based on

this language, *Forest Oil* found that the release language was clear, and enforced the

disclaimer-of-reliance provision. *See id.* at 60. In contrast to the contracts in *Barr*

and *Forest Oil*, the Repurchase Agreement contains no clear language expressly

disclaiming reliance. Thus, the Court finds that, as a matter of law, the Repurchase

Agreement does not bar Rakestraw's counterclaims.

**B.   WHETHER COLORADO'S ECONOMIC LOSS RULE BARS RAKESTRAW'S
      COUNTERCLAIMS**

Colorado's economic loss rule provides that a "party suffering only economic loss

from the breach of an express or implied contractual duty may not assert a tort claim

for such a breach absent an independent duty of care under tort law." *Kirzhner v.*

*Silverstein*, No. 09-cv-02858, 2010 WL 2985615, at *8 (D. Colo. July 23, 2010)

(unpublished) (quoting A.*C. Excavating v. Yacht Club II Homeowners Ass'n*, 114 P.3d

862, 865 (Colo. 2005)). "While contract obligations develop from promises made by the

parties, tort obligations arise from legal duties." *Greenway Univ., Inc. v. Greenway of Arizona, LLC*, No. 11-cv-01055, 2012 WL 1801948, at *2 (D. Colo. May 17, 2012) (unpublished).  Thus, the key inquiry in determining whether the economic loss rule bars a tort claim is discerning "the source of the party's duty." *A.C. Excavating*, 114 P.3d at 865.  "Where there exists a duty of care independent of any contractual obligations, the economic loss rule has no application and does not bar a plaintiff's tort claim because the claim is based on a recognized independent duty of care and thus falls outside the scope of the economic loss rule." *Id.* at 866 (internal citations omitted).    In response to XeDAR's motion to dismiss, Rakestraw alleges that his counter-claims "arise not under contractual rights but as a result of the independent duty of care (as well as the duty to abstain from fraudulent conduct) owed by XeDAR."  (Doc. # 13 at 14-15.)  The Court agrees.

Colorado courts have held that fraud claims cannot proceed where they arise from duties implicated by the parties' contract.  *See Hamon Contractors, Inc., v. Carter & Burgess, Inc.*, 229 P.3d 282, 290-95 (Colo. App. 2009); *see also Makoto USA, Inc. v. Russell*, 250 P.3d 625, 628 (Colo. App. 2009).  However, Rakestraw's counterclaims are not based on the breach of any duties arising from the Repurchase Agreement; rather Rakestraw's counterclaims are based on pre-contractual allegations of fraudulent inducement.[7]  *See Makoto*, 250 P.3d at 628 ("pre-contractual claims of fraudulent inducement might be considered independent of the contract – and hence not barred by

---

[7] Indeed, Rakestraw does not seem to dispute that the terms of the contract were performed when Rakestraw sold his shares and he received the agreed upon compensation in return.

11

the economic loss rule."). Thus, the Court finds that Rakestraw's counterclaims arise

independently of the contract because the allegations concern pre-contractual

fraudulent inducement, and tort law imposes a duty to abstain from fraud. *Greenway*

*Univ.*, 2012 WL 1801948, at *2; *Haynes Trane Serv. Agency, Inc. v. Am. Standard, Inc.*,

573 F.3d 947, 962 (10th Cir. 2009) ("Trane correctly contends that tort law imposed

a duty on Haynes TSA to abstain from fraud."). Accordingly, the Court finds that the

economic loss rule does not preclude Rakestraw from bringing his counterclaims.

**C.   WHETHER RAKESTRAW'S COUNTERCLAIMS SHOULD BE DISMISSED
UNDER FED. R. CIV. P. 12(b)(6)**

XeDAR contends that the Court should dismiss Rakestraw's five counterclaims

for common law fraud, common law negligent misrepresentation, violations of section

10(b) and Rule 10b-5 of the Securities Exchange Act of 1934, breach of contract, and

breach of fiduciary duty because the facts alleged by Rakestraw do not satisfy the

*Iqbal/Twombly* plausibility standard. At the outset, the Court notes that XeDAR does

not differentiate between Rakestraw's five different counterclaims, at least in this section

of its motion, which unnecessarily complicates the Court's review. (*See* Doc. # 9 at 6-

7.) However, as all of Rakestraw's counterclaims are based on the allegation that

XeDAR and its agents made false representations that no other company was

expressing interest in acquiring XeDAR, the Court will begin its analysis on whether

Rakestraw has plead an actionable claim for fraud. The Court will then discuss

Rakestraw's fourth counterclaim for "breach of contract" separately.

As set forth in the standard of review, the "plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678.  The Court finds that Rakestraw's allegations are sufficient to satisfy this pleading standard.

To bring a fraud claim in Colorado, a plaintiff is required to establish that: (1) the defendant made a false representation of material fact; (2) that the party making the representation knew it was false; (3) that the party to whom the representation was made did not know of the falsity; (4) that the representation was made with the intent that it would be acted upon; and (5) that the representation caused damages. *Brody v. Brock*, 897 P.2d 769, 775-76 (Colo. 1995).

Rakestraw has alleged that several agents of XeDAR told Rakestraw that no other company had expressed any interest in acquiring XeDAR  at the time that Rakestraw was considering selling his shares.  Rakestraw has also alleged that XeDAR and its agents knew of IHS' interest in an acquisition at the time XeDAR made such representations.  Certainly, as XeDAR correctly observes, the mere making of allegations does not suffice under *Iqbal/Twombly* standards.  However, although Rakestraw does not present the most airtight case, the Court finds that he supports his allegations with sufficient "factual enhancement" to withstand a motion to dismiss. *See Iqbal*, 556 U.S. at 678.

The main factual allegations supporting Rakestraw's counterclaims is that IHS delivered an "indication of interest" to XeDAR on March 23, 2012, a mere fifteen days

13

after XeDAR repurchased its shares from Rakestraw.  Although the timing of the "indication of interest" can be chalked up to mere coincidence, the timing is at least arguably suspicious and, at this stage of the proceedings, Rakestraw needs only allege sufficient facts to state a claim that is plausible.[8]  Furthermore, the timing of the "letter of interest" appears more suspicious in light of Rakestraw's allegation that Ms. Patterson told him the repurchase offer would remain open for one to two weeks only.  (Doc. # 6, ¶ 47.)  Thus, the Court finds Rakestraw has sufficiently plead that XeDAR and its agents knew of IHS' interest in acquiring XeDAR and failed to inform Rakestraw of that interest when he asked.

Additionally, Rakestraw alleges that he informed XeDAR and its agents that he had no intention of selling his shares in the event that there was any potential acquisition interest.  Thus, it can be reasonably inferred that the allegedly fraudulent statements or omissions were made with the intent that they would be acted upon.[9]  Further, Rakestraw has alleged that he was damaged by the fraudulent statements or omissions because he was induced to sell shares that he otherwise would have

---

[8] Standing alone, evidence of temporal proximity between Rakestraw's sale of his shares and the "indication of interest" may not be sufficient to survive summary judgment, but that question is for another day.

[9] In the economic loss rule portion of its' motion, XeDAR makes what appears to be a Fed. R. Civ. P. 12(b)(6) argument with respect to Rakestraw's counterclaim for violation of Rule 10b-5 of the Securities Exchange Act of 1934.  *See Dronsejko v. Thornton*, 632 F.3d 658, 665 (10th Cir. 2011) (listing elements of Rule 10b-5 claim).  XeDAR contends that Rakestraw's 10b-5 claim must be dismissed because he has failed to allege justifiable reliance.  (Doc. # 9 at 14-15.) However, this argument is premised on the contention that the Repurchase Agreement constitutes a formal disavowal of reliance, which is an argument the Court has already rejected. (*Id.* at 15.)  XeDAR also argues that Rakestraw has failed to allege the element of *scienter* for the same reason that XeDAR contends that Rakestraw's allegations are insufficient to allege a claim for fraud, an argument that the Court also rejects.  (*Id.*)

retained.  The Court finds that these allegations state a plausible claim of relief and provide sufficient specificity for XeDAR to respond and defend on the first, second, third, and fifth counterclaims.

Turning to Rakestraw's fourth counterclaim for "breach of contract," the Court agrees with XeDAR that this counterclaim is nonsensical, as Rakestraw admits that he received the agreed upon price for the sale of his shares.  (Doc. # 3, ¶ 9; Doc. # 6, ¶ 9.) The gist of this counterclaim is the same as the others, that XeDAR did not provide the requested information about IHS' acquisition interest.  (Doc. # 6, ¶¶ 70-72.)  Thus, Rakestraw's allegations necessarily relate to conduct that occurred prior to the formation of the Repurchase Agreement, and he points to no provision of the Repurchase Agreement that was breached by XeDAR.  Further, the Court finds that the "Breach of Contract" counterclaim is redundant to the other counterclaims brought by Rakestraw.  Thus, the Court will dismiss Rakestraw's fourth counterclaim for "Breach of Contract."

## IV. __CONCLUSION__

Based on the foregoing, it is ORDERED that Plaintiff XeDAR Corporation's

Motion to Dismiss Rakestraw's Counterclaims (Doc. # 9) is GRANTED IN PART and

DENIED IN PART.

Specifically, XeDAR's Motion is GRANTED insofar as it requests that

Rakestraw's Fourth Counterclaim for Breach of Contract be DISMISSED.  Thus,

Rakestraw's Fourth Counterclaim is DISMISSED.  XeDAR's Motion is DENIED in

all other respects.

DATED:  January __08__, 2013

BY THE COURT:

_____

CHRISTINE M. ARGUELLO
United States District Judge